**COHN LIFLAND PEARLMAN**
**HERRMANN & KNOPF LLP**
Kelly M. Purcaro
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600
Fax:  (201) 845-9423
kmp@njlawfirm.com

**GLANCY PRONGAY & MURRAY LLP**
Marc L. Godino
 *(pro hac vice to be filed)*
Lionel Z. Glancy
 *(pro hac vice to be filed)*
Danielle L. Manning
 *(pro hac vice to be filed)*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
mgodino@glancylaw.com
lglancy@glancylaw.com
dmanning@glancylaw.com

*Counsel for Plaintiff and the Class*
*[Additional Counsel appear on signature page]*

## UNITED STATES DISTRICT COURT
## THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAOUD SHAAYA, individually and on behalf of a class of all others similarly situated,<br><br>        Plaintiff,<br>  v.<br><br>JAGUAR LAND ROVER NORTH AMERICA LLC,<br>        Defendant. | Case No.: _____<br><br>      Civil Action<br><br>**CLASS ACTION COMPLAINT**<br>**& DEMAND FOR JURY TRIAL** |

Plaintiff Daoud Shaaya ("Plaintiff") residing at East 5th Street, Brooklyn, NY 11229, on behalf of himself and all others similarly situated, alleges the following against Defendant Jaguar Land Rover North America LLC ("Defendant" or "Jaguar Land Rover").

## I.     INTRODUCTION

1.     In order to meet stringent emissions requirements, beginning in 2009 Defendant equipped all diesel vehicles with an exhaust filter known as a Diesel Particulate Filter ("DPF"). Vehicles equipped with a DPF allegedly have more efficient emissions because DPFs efficiently capture and store soot particles from exhaust gases, helping to lower tailpipe emissions.  These soot particles must be burnt to keep the filter clean, through a combustion process known as regeneration.

2.     For regeneration to occur, a vehicle must be driven on a regular basis at highway speeds for prolonged periods of time.  Consequently, the DPF in Defendant's diesel vehicles is prone to become clogged under many normal operating conditions including, but not limited to, frequent stop-and-go traffic.  To make matters worse, Defendant's DPF warning light system often activates only after it is too late for regeneration to occur, necessitating costly replacement of the DPF.  These issues are collectively referred to herein as the "DPF Defect."

3.     The DPF Defect poses an extreme and unreasonable safety hazard to drivers, passengers, and pedestrians alike.  This is because a clogged DPF can cause sudden and unexpected loss of power that can severely inhibit vehicle performance and even complete shutdown.  The DPF Defect thus increases the risk of an accident as well as the risk that drivers will become stranded with an inoperable vehicle.

4.     Plaintiff is the purchaser of a 2018 Range Rover equipped with a DPF and seeks to represent all persons who purchased or leased 2018 Range Rover or other Jaguar Land Rover vehicle equipped with a substantially similar DPF system within the United States, or alternatively within the State of New York ("Class Vehicles").

5.     As a result of the DPF Defect, numerous Class Vehicle owners have had to replace their DPF at exorbitant costs.

6.      Defendant knew the Class Vehicles were defective and not fit for their intended purpose of providing consumers with safe and reliable transportation at the time of the sale and thereafter.  Defendant has actively concealed the true nature and extent of the DPF Defect from Plaintiff and the other Class Members, and failed to disclose it to them, at the time of purchase or lease and thereafter.  Had Plaintiff and prospective Class Members known about the DPF Defect, they would not have purchased the Class Vehicles or would have paid less for them.

7.      Despite notice of the DPF Defect from, among other things, pre-production testing, warranty data, customer complaints at dealerships, and dealership repair orders, Defendant has not recalled the Class Vehicles to repair the Defect, has not offered its customers a suitable repair or replacement free of charge, and has not offered to reimburse all Class Vehicle owners and leaseholders the costs they incurred relating to diagnosing and repairing the DPF Defect.

8.      Defendant knew of and concealed the DPF Defect that is contained in every Class Vehicle, along with the attendant dangerous safety problems and associated repair costs, from Plaintiff and the other Class Members both at the time of sale and repair and thereafter.  As a result of their reliance on Defendant's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles have suffered ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

## II.      PARTIES

### A.  <u>Plaintiff Daoud Shaaya</u>

9.      Plaintiff Daoud Shaaya is a New York citizen who lives in Brooklyn, Kings County, New York.  In or about July of 2018, Mr. Shaaya purchased a new 2018 Land Rover Range Rover HSE equipped with a diesel engine from Land Rover Manhattan in New York, New York.  At the time of purchase, Mr. Shaaya test drove the vehicle, spoke with the dealer sales representative about the vehicle and viewed the Monroney sticker posted on the side window of the vehicle.  Mr.

Shaaya was never informed by the dealer sales representative that his vehicle suffered from the DPF Defect and relied upon this fact in purchasing his vehicle. Had Mr. Shaaya been informed that his vehicle suffered from the DPF Defect, he would not have purchased it. Mr. Shaaya purchased his vehicle for personal, family or household purposes. Mr. Shaaya's vehicle was designed, manufactured, sold, distributed, advertised, marketed and warranted by Jaguar Land Rover.

10.     In about November 2018, the DPF warning light in Mr. Shaaya's vehicle illuminated in amber and instructed him to drive approximately forty miles per hour or above or above for approximately twenty minutes. Mr. Shaaya promptly attempted to drive to a highway so that he could follow these instructions, but the vehicle would not accelerate past nine miles per hour. Meanwhile, the DPF warning light turned from amber to red within an hour. Mr. Shaaya took his vehicle to Land Rover Manhattan and informed the service representative of the problem. At the time of service, Mr. Shaaya's vehicle had 3,325 miles on its odometer and was well within the vehicle's New Vehicle Limited Warranty ("NVLW") 48 months/50,0000 miles Basic Coverage and 96 months/80,000 miles Emissions Coverage. The service representative inspected Mr. Shaaya's vehicle and attempted a regeneration which failed. Mr. Shaaya was then informed that his DPF was full and required replacement at a cost of over $5,000.

11.     Mr. Shaaya complained that he was never informed prior to purchase that his filter would become clogged under normal driving conditions and would require replacement despite the fact that he had promptly attempted regeneration as instructed by his vehicle's warning lights. Mr. Shaaya requested that Land Rover Manhattan provide warranty coverage, which request Land Rover Manhattan in turn communicated to Defendant's customer relations department. Mr. Shaaya was ultimately denied warranty coverage and required to pay $3,122.98 out-of-pocket for

the repair of his DPF.  During his discussions with Land Rover Manhattan, Mr. Shaaya asked whether Land Rover Manhattan had received a lot of complaints regarding the problem he experienced, to which the service representative responded in the affirmative.  The service representative further informed Mr. Shaaya that Land Rover Manhattan was not taking any diesels for 2019 and would only be selling diesel vehicles on special request to limit the number of diesels sold because the problems were costing the dealership too much time.

12.    Mr. Shaaya's vehicle continued to suffer from the DPF Defect following this repair. This is because when repairs are performed one defective component is merely replace with a similarly defective component.  For example, in February of 2019 with 4,766 miles on his odometer, Mr. Shaaya's vehicle again displayed a DPF warning light and Mr. Shaaya promptly took his vehicle to Land Rover Manhattan.  The service representative inspected the vehicle and attempted a DPF regeneration which failed, and replaced the DPF this time under warranty.  Mr. Shaaya has continued to experience the DPF Defect since this repair.

**B. <u>Defendant</u>**

13.    Defendant, Jaguar Land Rover LLC is a limited liability company organized under the laws of the State of Delaware and registered to do business throughout the United States. Jaguar Land Rover's corporate headquarters are located at 555 Macarthur Blvd., Mahwah, New Jersey 07430.

14.    Jaguar Land Rover designees, manufactures, markets, distributes, services, repairs, sells and/or leases passenger vehicles, including the Class Vehicles, nationwide.  Jaguar Land Rover is the warrantor and distributor of the Class Vehicles in the United States.

15.    Whenever, in this Complaint, reference is made to any act, deed or conduct of Jaguar Land Rover, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees or representatives who was

actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant.

### III.    JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this class action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed the sum value of $5,000,000, exclusive of interests and costs.  There are more than 100 Class Members.  At least one Class Member is a citizen of a different state than the Defendant.

17.    This court also has federal question jurisdiction over this action under 28 U.S.C. §1331 because Plaintiff's claims under the Magnuson-Moss Act arise under federal law, 15 U.S.C. § 2301, et seq.  This Court has personal jurisdiction over Defendant because it's its principle place of business is located in New Jersey.

18.    Venue is proper in this District because Defendant is headquartered, and thus resides, in this District within the meaning of 28 U.S.C. §1391 and a substantial part of the acts and omissions alleged herein took place in this District, as the Class Vehicles are, were, and are regularly advertised, marketed, sold / leased and serviced in this District through Defendant's network of dealers.

### IV.    ADDITIONAL FACTUAL ALLEGATIONS

#### A.    How Defendant's DPF Functions

19.    Diesel particulate matter resulting from the incomplete combustion of diesel fuel produces soot (*i.e*., black carbon) particles.  The expulsion of soot and other particles from diesel engines worsen the particulate matter pollution in the air and are harmful to the environment and health.

20.    A DPF is a device designed to remove diesel particulate matter from the exhaust gas of a diesel engine.  As exhaust travels through the filter particulate matter particles are trapped

while the exhaust gas is allowed to escape.  These particles must be burnt through a combustion process called regeneration, or the DPF will become clogged.

21.    Regeneration, in turn, requires a high temperature to ensure effective combustion which is often only achieved under a high engine load.  By design, therefore, regeneration may occur automatically when a vehicle is driven regularly at highway speeds for extended periods of time (i.e., in excess of twenty or thirty minutes).  This process is called passive regeneration.  Many common driving conditions such frequent city driving in slow moving traffic or even driving in cold weather may not provide a sufficient opportunity for passive regeneration to occur, causing particulate matter to build up in the filter.  In such instances active regeneration—a process initiated by the vehicle's on-board computer to increase exhaust temperature so that the soot particles can be burnt -- is required.  For the active regeneration process to be effective, the vehicle must be driven at highway speeds for an extended period of time.

22.    Although Defendant has equipped its vehicles with warning lights to alert drivers when regeneration is necessary, this system is ineffective.  Defendant's DPF warning system has three lights that may appear on the display panel.  An amber light indicates regeneration is required, and instructs the driver to drive at highway speeds for approximately twenty minutes.  A red light indicates that the DPF is full and instructs the driver to contact a service center.  A green light will display when regeneration is complete.  However, by the time the amber light appears the filter is often already substantially clogged and requires replacement, or will require replacement in an extremely short period of time.  Consequently, if regeneration is even possible by the time of an amber light warning, the time to regenerate the filter is far too short.

23.    Mr. Shaaya estimates that the amber warning light on his vehicle has illuminated approximately ten times since he has owned the car. The time Mr. Shaaya has had to regenerate

his vehicle (i.e. the time between an amber warning light and a red warning light) has typically ranged from fifteen minutes to one hour, and has never been longer than a few hours. This window of time can translate to a driving distance of three or four miles in congested traffic before the amber light turns red.

24.    On more than one of these occasions, Mr. Shaaya's DPF failed to regenerate even though he followed the warning light's instructions.

25.    As one article explained: "There can be as little as a minute between the car alerting you to a problem and it going into limp home mode … In that time, and assuming you're on a clear road, you  must start the regen process, which involves driving the car at no less than 37 mph for 10 minutes with the engine turning at over 2000 rpm."[1]  In other words, by the time the warning light comes on, it is often essentially too late.

26.    The DPF system in all Jaguar Land Rover diesel vehicles in the United States and Europe is the same or substantially similar.

**B.    Defendant's Knowledge of the DPF Defect**

27.    Defendant's DPF is prone to clog under normal driving conditions for much of the country, such as driving frequently in congested urban traffic or even cold weather.  A DPF-equipped vehicle must be driven at highway speeds on a regular basis for the DPF for the process of passive regeneration to clean the DPF automatically.  Defendant was necessarily aware of this at the time it sold the Class Vehicles, but failed to inform Plaintiff and Class Members.  The fact that Defendant's vehicles incorporate a DPF warning system (albeit ineffective) evidences Defendant's knowledge.

---

[1]    Getting cleaned out: diesel particulate filters 10 years on, AutoCar, https://www.autocar.co.uk/car-news/features/getting-cleaned-out-diesel-particulate-filters-10-years (Feb. 3, 2019).

28.    Since Defendant's introduction of diesel engine vehicles equipped with DPFs, Defendant became aware of the DPF Defect through sources not available to Plaintiff and Class Members, including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Defendant's network of dealers and directly to Defendant, aggregate warranty data compiled from Defendant's network of dealers, testing conducted by Defendant in response to consumer complaints, and repair order and parts data received by Defendant from Defendant's network of dealers.

29.    During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles which would necessarily have taken place prior to the sale of the Class Vehicles, Defendant, directly and/or through its agents or affiliated companies in the supply chain, necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicle's DPF system:  its capabilities including its ability to passively or actively regenerate, and the conditions required to do so; the vehicle's ability to detect when active regeneration is needed; whether the warnings given to drivers were adequate and timely; how the DPF would experience performance problems or fail; and, the cumulative and specific impacts on the DPF caused by wear and use, the passage of time, driver habits, driving patterns, environmental factors, etc.

30.    An adequate pre-release analysis of the design, engineering, and manufacture of the DPF system used for the Class Vehicles would have revealed to Defendant that it does not operate properly and is not fit for its intended use.  Thus, during the pre-release design stage of the Class Vehicles, Defendant would have known that the DPF system in the Class Vehicles was defective and would pose a safety risk to owners/lessees and the motoring public.

31.     On January 11, 2015 Land Rover issued a press release touting the fuel efficient diesel powertrains in the 2016 model year Land Rover.[2]  The article describes, inter alia, how the exhaust gas recirculation ("EGR") system of the Land Rover takes low pressure gasses—after the DPF filter in the exhaust pipe—and feeds them back into the turbocharger inlet, resulting in a lower level of NOx emissions.  In a section titled "Tested and Proven in the USA" the article discusses the extensive diesel engine testing performed by Defendant in the United States:

> Land Rover engineers embarked on US testing schedule to ensure the new diesel engine could handle all US climate and terrain conditions.  By the time US sales have begun, the test fleet will have completed one million test miles.
>
> The test fleet has targeted the most extreme climates and diverse terrains imaginable across the US.  The new Range Rover and Range Rover Sport diesel have navigated from sea level to altitudes of 14,000 feet during the grueling test program.  To meet unique demands of the North American climate, engineers have undertaken testing year round, from the coldest winter days in Minnesota, to summertime in the deserts of the Southwest.

Surely such testing would have alerted Defendant to the fact that it's DPF's are prone to clog under various driving conditions, and that the DPF's warning light system is inadequate.

32.     In an August 2016 article, Jaguar boasts that "Throughout each stage of design, development and production, every component of a Jaguar goes through thousands of tests and checks for safety, durability and quality, ensuring that the finished product is the most reliable, dependable and safest car you can drive."[3]  The article goes on to detail the grueling physical testing to which vehicles are subjected:

> Although virtual engineering is a powerful tool, there's no substitute for physical testing in a laboratory environment as the ultimate proof of concept for reliability

---

[2]  *See* Land Rover Brings Two-Luxury Diesel SUV models North America Market available at https://media.landrover.com/en-us/news/2015/01/land-rover-brings-two-luxury-diesel-suv-models-north-america-market.

[3] *See* https://www.jaguar.com/about-jaguar/reliability/testing-process.html

and durability. We have doubled the size of our structural test facilities in recent years, with a £22m investment to further enhance our state-of-the-art labs.

New transmission designs go through a continuous 12-week rig test, simulating a 10-year 240,000 kilometre cycle that includes town driving, high-speed highway driving and track driving. This is repeated six times for different engine and transmission variants, meaning that every new gearbox is tested for 72 weeks and 1.45 million kilometres – the equivalent of driving to the moon and back. There are also shift cycle tests that put the clutch through a gruelling series of high-speed shifts, and steady-state tests where the transmission is run at high levels of torque for long periods.

Our engines have their own comprehensive suite of static rig and dynamometer tests, with the new generation of Ingenium engines having gone through 72,000 hours of durability testing – equivalent to eight years of real-world tests – before they hit the road for two million kilometres of final validation testing.

Individual components can be tested in the Environmental Robotic Durability Cell, which uses four robots, which can be used to test everything from seatbelt activation and release, door opening and closing, and key turns. Vehicle noise, vibration and harshness qualities are also refined in advanced anechoic sound chambers.

Climate Chambers replicate the world's toughest weather conditions, freezing cars to -40ºC in hurricane-strength winds, or replicating the sort of +50ºC temperatures and solar loads of up to 1,200W/m2 that you'd expect in the Sahara desert  – all without vehicles ever having to leave the UK. Water-tightness is proven with monsoon soak tests, drizzle tests that last up to 16 hours, and freeze tests.

Physical laboratory testing even extends to interior features such as the rotary JaguarDrive Selector, which was subject to every abuse imaginable during its development. "A bottle of cola is a tough test, as the sugar turns to treacle in hot climates," says Julian Jones, User Controls Manager. "Sand can also be bad if it gets in the DriveSelector's gears." Each test takes a month to run, with the DriveSelector having to cycle 60,000 times without fault.

Surely such testing would similarly have placed Defendant on notice of the DPF Defect.

33.    Defendant also would have known about the DPF Defect because of the higher than expected number of replacement exhaust filters ordered from Defendant, which should have alerted Defendant that the DPF system was defective.  Defendant's service centers use Defendant's replacement parts that they order directly from Defendant. Therefore, Defendant would have detailed and accurate data regarding the number and frequency of replacement part orders,

including replacement exhaust filters. The ongoing high sales of replacement exhaust filters was known to Defendant, and would have alerted Defendant that its DPF system was defective and posed a safety risk early on.

34.    Defendant also knew about the DPF Defect because numerous consumer complaints regarding DPF replacements were made directly to Defendant. The large number of complaints, and the consistency of their descriptions of DPF defect alerted Defendant to this serious Defect affecting the Class Vehicles.  The full universe of complaints made directly to Defendant about the DPF Defect is information presently in the exclusive custody and control of Defendant and is not yet available to Plaintiff prior to discovery.  However, upon information and belief, many Class Vehicle owners complained directly to Defendant and Defendant's dealerships and service centers about the repeated need for exhaust filter replacements that their vehicles experienced.

35.    Defendant also knew about the DPF Defect from a number of public complaints, and articles complaining of the DPF Defect, posted on the Internet and elsewhere.  By way of example on March 30, 2017, AOL published an article titled "Furious Range Rover owner vandalises his own car."[4]  In relevant part the article explained that:

> Dev Bath, 30, paid more than £70,000 for the black Range Rover Sport, and has threatened to burn it live on camera if manufacturer Land Rover fails to sort out its alleged issues.

> He ditched the SUV in a Mayfair street on Tuesday, and claims Land Rover has repeatedly asked him to remove the vehicle as it is 'damaging its brand'.

---

[4] *Id*., available at https://www.aol.co.uk/cars/2017/03/30/furious-range-rover-owner-vandalises-his-own-car/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAMGKzPXJAZKWcJEFQ7_yryLVEPmE0_Fkbsj9EKvfcvSGNDwOkEw8qE9GBe44vhI6ecbHTXHlaBa-HRgfS9vOoBKPndXzjByenvnqGCb40l2lTaPtDfkV6_rB94Ynbcuy68L-CBMsSgXLymREHd8CS7n_2wstvGFIWTXozi4dj9mN (Mar. 30, 2017).

> One of the messages Bath left on the car reads: 'Be careful, don't buy from Range Rover. I got ripped off. They sold me this junk.'
> . . .
> 'I've only had it for 10 months and we've had nothing but problems. We had had it for six weeks when the yellow light first came on saying I had to drive the car for thirty minutes at 50mph.'
>
> "No-one told me this when I bought the car. Where can you do that in London? Range Rover haven't done anything to help me so I thought what better place to park it than on Berkley Street in Mayfair?'

*Id.* The article concluded by a Land Rover spokeswoman commenting that: "The customer is complaining of a full DPF (Diesel Particulate Filter) owing to the urban cycle the vehicle has been used on, which would be the case in any diesel with a DPF. There is no fault with the vehicle. Land Rover is trying to work with the customer to bring the situation to a mutually satisfactory conclusion." *Id.* Therefore, by March of 2017, Jaguar Land Rover was aware of DPF Defect, but refused to acknowledge the Defect or offer an adequate fix, instead blaming the customer's driving style.

36.    Notwithstanding its longstanding knowledge of the DPF Defect, Defendant has actively concealed the Defect, failed to disclose the Defect to its customers prior to or at the time of purchase of their vehicles, and failed to provide a remedy for the DFF Defect to date.

37.    Customers have reported the DPF Defect in the Class Vehicles to Defendant directly and through its dealers. Indeed, when Plaintiff informed Land Rover Manhattan about his DFF Defect, the service representative informed him that this was a common problem and that the dealership would only be selling diesel vehicles in 2019 on special request to limit the number of diesels sold because the problems were costing the dealership too much time.

38.    Defendant is fully aware of the DPF Defect contained in the Class Vehicles. Nevertheless, Defendant actively concealed the existence and nature of the Defect from Plaintiff and the other Class Members at the time of purchase or repair and thereafter. Specifically, Defendant:

a.      failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the DPF Defect;

b.      failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles and their DPFs were not in good working order, were defective, and were not fit for their intended purpose; and,

c.      failed to disclose and/or actively concealed the fact that the Class Vehicles and their DPFs were defective, despite the fact that Defendants learned of the DPF Defect prior to releasing its vehicles equipped with diesel engines, and prior to Plaintiff's purchase of his vehicle.

39.     Defendant has deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to expend money at its dealerships or other third-party repair facilities and/or take other remedial measures related to the DPF Defect contained in the Class Vehicles.

40.     Defendant has not recalled the Class Vehicles to repair the DPF Defect, has not offered to its customers a suitable repair or replacement of parts related to the DPF Defect free of charge, and has not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the DPF Defect.

41.     Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

42.     As a result of the DPF Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.  Reasonable consumers, like Plaintiff, expect and assume that a vehicle's DPF and related components are not defective and

will not malfunction while operating the vehicle as it is intended. Plaintiff and Class Members further expect and assume that Defendant will not sell or lease vehicles with known safety defects, such as the DPF Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable repair or non-defective replacement.

### C.    Tolling of the Statute of Limitations

43.    Plaintiff and the other Class Members were not reasonably able to discover the DPF Defect, despite their exercise of due diligence.

44.    Despite their due diligence, Plaintiff and the other Class Members could not reasonably have been expected to learn or discover that they were deceived and that material information concerning the Class Vehicles and their DPF systems was concealed from them.

45.    In addition, even after Class Members contacted Defendant and/or its authorized agents for vehicle repairs concerning the defective nature of the Class Vehicles and their DPFs, they were routinely told by Defendant and/or through their authorized agents for vehicle repairs that the Class Vehicles are not defective.

46.    Hence, any applicable statute of limitation, if any, has been tolled by Defendant's knowledge, active concealment, and denial of the facts alleged herein.

### V.    CLASS ACTION ALLEGATIONS

47.    Plaintiff bring this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

48.    The Class and Sub-Class are defined as follows:

**Nationwide Class:** All persons who purchased or leased a diesel engine-powered 2018-2020 Land Rover Range Rover or other diesel engine-powered Jaguar Land

Rover vehicle equipped with a substantially similar DPF system within the United States.

**New York Sub-Class:** All persons who purchased or leased a diesel engine-powered 2018-2020 Land Rover Range Rover or other diesel engine-powered Jaguar Land Rover vehicle equipped with a substantially similar DPF system within the State of New York.

49.    Excluded from the Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class definition, and to add subclasses, if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

50.    **Numerosity**: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from, inter alia, information and records in Defendant's possession, custody, or control.

51.    **Typicality**: The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all Class Members, paid for a Class Vehicle designed, manufactured, and distributed by Defendant which is subject to the DPF Defect. The representative Plaintiff, like all Class Members, have been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing a defective or full DPF. Further, the factual bases of Defendant's misconduct are common to all Class Members and represent a common thread of fraudulent, deliberate, and/or grossly negligent misconduct resulting in injury to all Class Members.

52.    **Commonality:** There are numerous questions of law and fact common to Plaintiff and the Classes that predominate over any question affecting only individual Class Members. These common legal and factual questions include the following:

a.    whether the Class Vehicles suffer from the DPF Defect;

b.    whether the DPF Defect constitutes an unreasonable safety hazard;

c.    whether the defective nature of the Class Vehicles' DPF system constitutes a material fact;

d.    whether Defendant had and has a duty to disclose the defective nature of the Class Vehicles' DPF system to Plaintiff and the other Class Members;

e.    whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

f.    whether Defendant knew or reasonably should have known of the DPF Defect contained in the Class Vehicles before it sold or leased them to Class Members; and

g.    Whether Defendant violated: (1) New York's General Business Law for Deceptive Acts or Practices § 349; (2) Breach of Express Warranty (N.Y. U.C.C. § 2-313); (3) common law fraudulent omission; (4) Breach of Written Warranty Under the Magnuson-Moss Warranty Act (15 U.S.C. §2301, *et seq.*); and (5) was unjustly enriched.

53.    **Adequate Representation**:  Plaintiff will fairly and adequately protect the interests of the Class Members.  Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiff intends to prosecute this action vigorously.

54.    **Predominance and Superiority:**    Plaintiff and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

## VI.    CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF NEW YORK'S GENERAL BUSINESS LAW FOR DECEPTIVE ACTS OR PRACTICES § 349 ("N.Y. GBL")**
**(On behalf of the Nationwide Class or, in the Alternative,**
**on behalf of the New York Sub-Class)**

55.    Plaintiff incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

56.    Plaintiff brings this cause of action on behalf of himself and the Nationwide Class, or in the alternative, the New York Sub-Class.

57.    Plaintiff and Class Members are "persons" within the meaning of N.Y. GBL § 349(h).

58.     The N.Y. GBL § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."   Defendant's conduct, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL § 349. Furthermore, Defendant's deceptive acts and practices, which were intended to mislead consumers who were in the process of purchasing and/or leasing the Defective Vehicles, constitute conduct directed at consumers.

59.     Defendant knew that the Class Vehicles' suffered from the DPF Defect, as described herein.

60.     In failing to disclose the DPF Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so, thereby engaging in deceptive acts or practices within the meaning of the N.Y. GBL § 349.

61.     Defendant was under a duty to Plaintiff and the other Class Members to disclose the defective nature of the Class Vehicles' DPFs because:

a.     Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' DPF system;

b.     Plaintiff and the Class Members could not reasonably have been expected to learn or discover that their DPF systems were defective until after they purchased the Class Vehicles;

c.     Defendant knew that Plaintiff and Class Members could not reasonably have been expected to learn about or discover the DPF Defect; and

d.     Defendant actively concealed the defective nature of the Class Vehicles' DPF system from Plaintiff and Class Members at the time of sale and thereafter.

62.     The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them.

63.     Defendant continued to conceal the defective nature of the Class Vehicles and their DPFs even after Class Members began to report problems.  Indeed, Defendant continues to cover up and conceal the true nature of this systematic problem today.

64.     Plaintiff also asserts a violation of public policy arising from Defendant's withholding of material safety facts from consumers.  Defendant's violation of consumer protection and unfair competition laws resulted in harm to consumers.

65.     Defendant's omissions of material facts, as set forth herein, also constitute deceptive acts or practices because they violate consumer protection laws, warranty laws and the common law as set forth herein.

66.     Thus, by its conduct, Defendant has engaged in deceptive acts or practices within the meaning of the N.Y. GBL § 349.

67.     Defendant's deceptive acts or practices occurred repeatedly in Defendant's trade or business, and were capable of deceiving a substantial portion of the purchasing public.

68.     As a direct and proximate result of Defendant's deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages. Had Plaintiff and other Class Members known that the Class Vehicles suffered from the DPF Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.  Moreover, Plaintiffs and Class Members have had to pay out of pocket expenses to repair the DPF Defect.

69.    Since Defendant's willful and knowing conduct caused injury to Plaintiff and Class Members, Plaintiff seeks recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, and an order enjoining Defendant's deceptive conduct, and any other just and proper relief available under N.Y. GBL § 349.

## COUNT II

### BREACH OF EXPRESS WARRANTY N.Y. U.C.C. § 2-313
### (On behalf of the Nationwide Class or, in the Alternative, on behalf of the New York Sub-Class)

70.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

71.    Plaintiff brings this cause of action on behalf of himself and the Nationwide Class, or in the alternative, the New York Sub-Class.

72.    Defendant provided all purchasers and lessees of the Class Vehicles with the NVLW described herein, which became a material part of the bargain.  Accordingly, Defendant's express warranty is an express warranty under New York law.

73.    In NVLW, Defendant expressly warranted that it covered "defects in factory-supplied materials or factory workmanship." Defendant's NVLW provided 48 months/50,000 miles Basic Coverage and 96 months/80,000 miles Emissions Coverage.  Plaintiff's vehicle is within the mileage and durational limits of both of these coverage periods.

74.    Defendant breached the express warranty through the acts and omissions described above.

75.    Plaintiff was not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile.

Defendant was on notice of the DPF Defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the Class Vehicles' DPFs, and through other internal sources. Nevertheless, in connection with Plaintiff's November 2018 repair and request for warranty coverage, Defendant's customer relations department was contacted and placed on direct notice of Plaintiff's claim.

76.     As a result of Defendant's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles have suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the DPF Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles DPFs are substantially certain to fail before their expected useful life has run.

77.     As a result of Defendant's breach of the express warranty, Plaintiff and Class Members are entitled to legal and equitable relief against Defendant, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

78.     In addition, with respect to Class Members whose vehicles failed after the expiration of the applicable warranty period and were repaired within reasonable time thereafter, the durational limits of the warranty are unconscionable pursuant to New York Uniform Commercial Code Sec. 2-302(1) and (2), because as alleged herein, Defendant was aware of the basic defects in the DPF system prior to selling or leasing the Class Vehicles and knew or should have known that the Class Vehicles suffered from the DPF Defect, but concealed or intentionally failed to reveal this information to Class Members in order to cause them to wait until after the warranty period to seek repairs.

## COUNT III

### FRAUDULENT OMISSION
### (On behalf of the Nationwide Class or, in the Alternative,
### on behalf of the New York Sub-Class)

79.     Plaintiff incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

80.     Plaintiff brings this cause of action on behalf of himself and the Nationwide Class, or in the alternative, the New York Sub-Class.

81.     Defendant knew that the Class Vehicles' front DPF were defectively designed and/or manufactured, would fail, and were not suitable for their intended use.

82.     Defendant concealed from and failed to disclose to Plaintiff and Class Members the defective nature of the Class Vehicles and their DPFs.

83.     Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles' front DPF because:

a.      Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' DPF system;

b.      Plaintiff and the Class Members could not reasonably have been expected to learn or discover that their DPF systems were defective until after they purchased the Class Vehicles;

c.      Defendant knew that Plaintiff and Class Members could not reasonably have been expected to learn about or discover the DPF Defect; and

d.      Defendant actively concealed the defective nature of the Class Vehicles' DPF system from Plaintiff and Class Members at the time of sale and thereafter.

84.     The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Had Plaintiff and Class Members known about the defective nature of the Class Vehicles' DPF systems, they would not have purchased or leased the Class Vehicles, or would have paid less for them.

85.     Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defect(s) contained in the Class Vehicles' DPF system in order to induce Plaintiff and Class Members to act thereon.  Plaintiff and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiff's and Class Members' purchase or lease of Defendant's defective Class Vehicles.

86.     Defendant continued to conceal the defective nature of the Class Vehicles' DPF even after Class Members began to report problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

87.     As a direct and proximate result of Defendant's misconduct, Plaintiff and Class Members have suffered and will continue to suffer actual damages.

**COUNT IV**

**BREACH OF WRITTEN WARRANTY UNDER MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301 *et seq.***
**(On behalf of the Nationwide Class or, in the Alternative, on behalf of the New York Sub-Class)**

88.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

89.     Plaintiff brings this cause of action on behalf of himself and the Nationwide Class, or in the alternative, the New York Sub-Class.

90.     Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

91.     Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

92.     The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

93.     Defendant's express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

94.     Defendant breached the express warranty by virtue of the above-described acts.

95.     Plaintiff and the other Class Members notified Defendant of the breach within a reasonable time and/or were not required to do so.  Defendant was also on notice of the DPF Defect from, among other sources, Defendant's extensive pre-release testing, complaints from Class Members and dealer requests/feedback.

96.     Defendant's breach of the express warranty deprived Plaintiff and Class Members of the benefits of their bargains.

97.     As a direct and proximate result of Defendant's breach of the express warranty, Plaintiff and the other Class Members sustained damages and other losses in an amount to be determined at trial.  Defendant's conduct damaged Plaintiff and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorney fees and/or other relief as appropriate.

## COUNT V

### UNJUST ENRICHMENT
### (On behalf of the Nationwide Class or, in the Alternative,
### on behalf of the New York Sub-Class)

98.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

99.     Plaintiff brings this cause of action on behalf of himself and the Nationwide Class, or in the alternative, the New York Sub-Class.

100.    As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles.  Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

101.    Additionally, as a direct and proximate result of Defendant failure to disclose the DPF Defect in the Class Vehicles, Plaintiff and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

102.    Defendant has been unjustly enriched due to the known DPF Defect in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendant profits when said money should have remained with Plaintiff and Class Members.

103.    As a result of Defendant's unjust enrichment, Plaintiff and Class Members have suffered damages.

### PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, requests that the Court enter judgment against Defendant, and issue an order providing the following relief:

## AS TO THE CLASS CLAIMS

a.    That Defendant provide notice, in a form pre-approved by the counsel identified below, to all Class Members, and in the said notice offer to replace the defective DPF system contained in every Class Vehicle with a non-defective DPF system;

b.    That Defendant provide notice, in a form pre-approved by the counsel identified below, to all Class Members, and in the said notice extend the warranty for the Class Vehicles' DPF system as appropriate;

c.    That Defendant offer to reimburse all Class Members all expenses already incurred as a result of the DPF Defect, including repairs, diagnostics, and any other consequential and incidental damages (*e.g.* towing charges, vehicle rentals, etc.);

d.    That Defendant immediately cease the sale and leasing of the Class Vehicles at all authorized Jaguar Land Rover dealerships without first notifying the purchasers of the DPF Defect, and otherwise immediately cease to engage in the violations of law as set forth above;

e.    Damages and restitution in an amount to be proven at trial;

f.    An order certifying the proposed Class and Sub-Class, designating Plaintiff as named representative of the Class and Sub-Class, and designating the undersigned as Class Counsel;

g.    A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles' DPF;

h.    Any and all remedies provided pursuant to the state consumer protection laws, express and implied warranty laws, and fraudulent omissions laws alleged herein;

i.    An award to Plaintiff and the Class of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

j.      A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, and/or make full restitution to Plaintiff and Class Members;

k.      An award of attorneys' fees and costs, as allowable under the N.J. Stat. Ann. § 56:8-19, N.Y. G.BL. § 349(h), and the other laws pursuant to which Plaintiff's claims are brought or as otherwise allowed by law;

l.      An award of pre-judgment and post-judgment interest, as provided by law;

m.      Leave to amend the Complaint to add additional class representatives, and conform to the evidence produced at trial; and

n.      Such other relief as may be appropriate under the circumstances.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.


Dated: May 7, 2020                              Respectfully submitted,

                                                 */s/ Kelly M. Purcaro*
                                                Kelly M. Purcaro
                                                **COHN LIFLAND PEARLMAN**
                                                 **HERRMANN & KNOPF LLP**
                                                Park 80 West – Plaza One
                                                250 Pehle Avenue, Suite 401
                                                Saddle Brook, NJ 07663
                                                Tel.:  (201) 845-9600
                                                Fax:  (201) 845-9423
                                                kmp@njlawfirm.com

                                                 Marc L. Godino
                                                 *(pro hac vice to be filed)*
                                                 Lionel Z. Glancy
                                                 *(pro hac vice to be filed)*
                                                 Danielle L. Manning
                                                 *(pro hac vice to be filed*
                                                 **GLANCY PRONGAY & MURRAY LLP**
                                                 1925 Century Park East, Suite 2100
                                                 Los Angeles, California 90067
                                                 Tel: (310) 201-9150
                                                 Fax: (310) 201-9160
                                                 mgodino@glancylaw.com
                                                 lglancy@glancylaw.com
                                                 dmanning@glancylaw.com

Kevin Landau
(*pro hac vice* to be filed)
Charles Goulding
(*pro hac vice* to be filed)
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel: (646) 873-7654
Fax: (212) 931-0703
klandau@tcllaw.com
cgoulding@tcllaw.com

Mark S. Greenstone
 (*pro hac vice* to be filed)
**GREENSTONE LAW PC**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Tel: (310) 201-9156
FaX: (310) 201-9160
mgreenstone@greenstonelaw.com

*Counsel for Plaintiff and the Class*