**A.Y. STRAUSS, LLC**
Kelly M. Purcaro
101 Eisenhower Square, Suite 101
Roseland, New Jersey 07068
Tel.: (973) 287-5008
Fax: (973) 226-4104
kpurcaro@aystrauss.com

**GLANCY PRONGAY & MURRAY LLP**
Marc L. Godino
*(admitted pro hac vice)*
Danielle L. Manning
*(admitted pro hac vice)*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160
mgodino@glancylaw.com
lglancy@glancylaw.com
dmanning@glancylaw.com

*Counsel for Plaintiff and the Class*
*[Additional Counsel appear on signature page]*

## UNITED STATES DISTRICT COURT
## THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAOUD SHAAYA and MARK FREIBURGHOUSE, individually and on behalf of a class of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> JAGUAR LAND ROVER NORTH AMERICA LLC, <br><br> Defendant. | Case No.: 2:20-cv-05679-CCC-MF <br><br> Civil Action <br><br> **AMENDED CLASS ACTION COMPLAINT & DEMAND FOR JURY TRIAL** |

Plaintiffs Daoud Shaaya and Mark Freiburghouse ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against Defendant Jaguar Land Rover North America LLC ("Defendant" or "Jaguar Land Rover").

## I.      INTRODUCTION

1.      In order to meet stringent emissions requirements, beginning in 2009 Defendant equipped all diesel vehicles with an exhaust filter known as a Diesel Particulate Filter ("DPF").  Vehicles equipped with a DPF allegedly have more efficient emissions because DPFs efficiently capture and store soot particles from exhaust gases, helping to lower tailpipe emissions.  These soot particles must be burnt to keep the filter clean, through a combustion process known as regeneration.

2.      For regeneration to occur, a vehicle must be driven on a regular basis at highway speeds for prolonged periods of time.  Consequently, the DPF in Defendant's diesel vehicles is prone to becoming clogged under many normal operating conditions including, but not limited to, frequent stop-and-go traffic.  To make matters worse, Defendant's DPF warning light system often activates only after it is too late for regeneration to occur, necessitating costly replacement of the DPF.  These issues are collectively referred to herein as the "DPF Defect."

3.      The DPF Defect poses an extreme and unreasonable safety hazard to drivers, passengers, and pedestrians alike.  This is because a clogged DPF can cause sudden and unexpected loss of power that can severely inhibit vehicle performance

and even complete shut-down.  The DPF Defect thus increases the risk of an accident as well as the risk that drivers will become stranded with an inoperable vehicle.  In addition, a clogged DPF substantially raises the risk of a vehicle fire because the engine and various components of the vehicle's undercarriage can become extremely hot.  A clogged DPF also poses a safety risk because of the potential for exhaust inhalation by vehicle occupants.

4.     Plaintiffs are purchasers of Range Rover vehicles equipped with a DPF and seek to represent all persons who purchased or leased 2016-2020 Range Rover or other Jaguar Land Rover vehicle equipped with a substantially similar DPF system within the United States, or alternatively within the States of New York and California ("Class Vehicles").

5.     As a result of the DPF Defect, numerous Class Vehicle owners have had to replace their DPF at exorbitant costs and/or contend with ongoing DPF issues that remain unresolved.

6.     Defendant knew the Class Vehicles were defective and not fit for their intended purpose of providing consumers with safe and reliable transportation at the time of the sale and thereafter.  Defendant has actively concealed the true nature and extent of the DPF Defect from Plaintiffs and the other Class Members, and failed to disclose it to them, at the time of purchase or lease and thereafter.  Had Plaintiffs

and prospective Class Members known about the DPF Defect, they would not have purchased the Class Vehicles or would have paid less for them.

7.     Defendant was aware of the DPF Defect at the time it placed the Class Vehicles on the road because it is a design defect with consequences that were necessarily known to Defendant.  Defendant was also aware of the DPF Defect from, among other things, pre-production testing, warranty data, customer complaints at dealerships, and dealership repair orders submitted to Defendant.  Notwithstanding its awareness of the DPF Defect, Defendant has not recalled the Class Vehicles to repair the Defect, has not offered its customers a suitable repair or replacement free of charge, and has not offered to reimburse all Class Vehicle owners and leaseholders the costs they incurred relating to diagnosing and repairing the DPF Defect.

8.     Defendant knew of and concealed the DPF Defect that is contained in every Class Vehicle, along with the attendant dangerous safety problems and associated repair costs, from Plaintiffs and the other Class Members both at the time of sale and repair and thereafter.  As a result of their reliance on Defendant's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles have suffered ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

## II. PARTIES

**Plaintiff Daoud Shaaya**

9. Plaintiff Daoud Shaaya is a New York citizen who lives in Brooklyn, Kings County, New York. In or about July of 2018, Mr. Shaaya leased a new 2018 Land Rover Range Rover HSE equipped with a diesel engine from Land Rover Manhattan in New York, New York. At the time he leased his vehicle, Mr. Shaaya test drove the vehicle, spoke with the dealer sales representative at length about the vehicle and viewed the Monroney sticker posted on the side window of the vehicle. At the time he leased his vehicle, Mr. Shaaya was not aware that his vehicle was equipped with a DPF or of the unique driving requirements necessary for the DPF regeneration process to occur; nor did the dealer service representative inform him of the existence of the DPF or its driving requirements. Mr. Shaaya was never informed by the dealer sales representative that his vehicle suffered from the DPF Defect and relied upon this fact in leasing his vehicle. Had Mr. Shaaya been informed that his vehicle suffered from the DPF Defect, he would not have leased it. Mr. Shaaya purchased his vehicle for personal, family or household purposes. Mr. Shaaya's vehicle was designed, manufactured, sold, distributed, advertised, marketed and warranted by Jaguar Land Rover.

10. In about November 2018, the DPF warning light in Mr. Shaaya's vehicle illuminated in amber and instructed him to drive approximately 40 miles per hour or above or above for approximately 20 minutes. Mr. Shaaya promptly

attempted to drive to a highway so that he could follow these instructions, but the vehicle would not accelerate past nine miles per hour. Meanwhile, the DPF warning light turned from amber to red within an hour. Mr. Shaaya took his vehicle to Land Rover Manhattan and informed the service representative of the problem.  At the time of service, Mr. Shaaya's vehicle had 3,325 miles on its odometer and was well within the vehicle's New Vehicle Limited Warranty ("NVLW") 48 months/50,0000 miles Basic Coverage and 96 months/80,000 miles Emissions Coverage.  The service representative inspected Mr. Shaaya's vehicle and attempted a regeneration which failed.  Mr. Shaaya was then informed that his DPF was full and required replacement at a cost of over $5,000.  It is Mr. Shaaya's understanding that the dealer did not offer warranty coverage, even though his vehicle was within warranty, because it took the position that the problems he experienced were due to the manner in which the vehicle as driven.  This is a common position taken by Defendant and its dealers to evade responsibility for DPF repairs.

11.     Mr. Shaaya complained that he was never informed prior to purchase that his DPF would become clogged under normal driving conditions and would require replacement despite the fact that he had promptly attempted regeneration as instructed by his vehicle's warning lights.  Mr. Shaaya requested that Land Rover Manhattan provide warranty coverage, which request Land Rover Manhattan in turn communicated to Defendant's customer relations department.  However, Defendant

denied his request.  After extensive negotiations, the Land Rover Manhattan required Mr. Shaaya to pay $3,122.98 out-of-pocket for the repair of his DPF.  During his discussions with Land Rover Manhattan, Mr. Shaaya asked whether Land Rover Manhattan had received a lot of complaints regarding the problem he experienced, to which the service representative responded in the affirmative.  The service representative further informed Mr. Shaaya that Land Rover Manhattan was not taking any diesels for 2019 and would only be selling diesel vehicles on special request to limit the number of diesels sold because the problems were costing the dealership too much time.

12.    Mr. Shaaya's vehicle continued to suffer from the DPF Defect following this repair.  This is because when repairs are performed one defective component is merely replaced with a similarly defective component.  For example, in February of 2019 with 4,766 miles on his odometer, Mr. Shaaya's vehicle again displayed a DPF warning light and Mr. Shaaya promptly took his vehicle to Land Rover Manhattan.  The service representative inspected the vehicle and attempted a DPF regeneration which failed, and replaced the DPF this time under warranty.  Mr. Shaaya has continued to experience the DPF Defect since this repair.

13.    At all times Mr. Shaaya has driven his vehicle in a foreseeable manner and in the manner in which a vehicle is typically intended to be driven.

**Plaintiff Mark Freiburghouse**

14.     Plaintiff Mark Freiburghouse is a citizen of California who lives in Long Beach, California.   In or about the end of December of 2016, Mr. Freiburghouse purchased a new 2017 Land Rover Range Rover Sport HSE equipped with a diesel engine from Penske Jaguar Land Rover in Cerritos, California.  Prior to purchasing his vehicle, Mr. Freiburghouse visited Land Rover dealers in Newport Beach, Carlsbad, and the Los Angeles South Bay to view Range Rover vehicles.  At the time he purchased his vehicle, Mr. Freiburghouse test drove the vehicle, spoke with the dealer sales representative at length about the vehicle and viewed the Monroney sticker posted on the side window of the vehicle.  At the time of purchase, Mr. Freiburghouse was not aware that his vehicle was equipped with a DPF or of the unique driving requirements necessary for the DPF regeneration process to occur; nor did the dealer service representative inform him of the existence of the DPF or its diving requirements.  Mr. Freiburghouse was never informed by the dealer sales representative that his vehicle suffered from the DPF Defect and relied upon this fact in purchasing his vehicle.  Had Mr. Freiburghouse been informed that his vehicle suffered from the DPF Defect, he would not have purchased it.  Mr. Freiburghouse purchased his vehicle for personal, family or household purposes.   Mr. Freiburghouse's vehicle was designed, manufactured, sold, distributed, advertised, marketed and warranted by Jaguar Land Rover.

15.     Recently, in or about the beginning of August, 2020, Mr. Freiburghouse's check engine light illuminated.  Mr. Freiburghouse's DPF warning light did not illuminate.  Mr. Freiburghouse drove promptly to Penske Jaguar Land Rover to have his vehicle inspected and was told that an appointment was not available for two weeks.  Mr. Freiburghouse made an appointment and returned on August 18, 2020.  Penske Jaguar Land Rover ran a diagnostic test and informed Mr. Freiburghouse that his DPF was clogged, and that his diesel exhaust fluid had become compromised.  Penske Jaguar Land Rover replaced the fluid and induced a regeneration to clean the DPF.  Mr. Freiburghouse picked up his vehicle on Friday, August 21, 2020.  Two days later on Sunday, August 23, 2020, Mr. Freiburghouse contacted Penske Jaguar Land Rover to inform them that his engine light was on again, and to inquire as to why his amber DPF warning light had never illuminated even though his vehicle's DPF needed regeneration.  The following day he was advised to bring his vehicle back to the dealer, which he did.  On Wednesday, August 26, 2020, Mr. Freiburghouse was informed that Penske Jaguar Land Rover was replacing his diesel exhaust fluid tank and the injector for the diesel exhaust fluid.  With regard to Mr. Freiburghouse's repeated inquiries as to why his DPF warning light never illuminated, the dealer service representative sent Mr. Freiburghouse the following explanation via text message which stated, in pertinent part: "the message for the particulate filter won't come on unless the system is completely

blocked/clogged and then the vehicle would go into fail-safe mode (won't accelerate past 30 mph)."   At the time of servicing, Mr. Freiburghouse's vehicle had approximately 22,396 miles on its odometer and was within the vehicle's NVLW of 48 months/50,0000 miles Basic Coverage and 96 months/80,000 miles Emissions Coverage.   Nevertheless, the dealership initially attempted to charge him a $189 diagnostic fee, suggesting that the DPF problems he experienced were because of the manner in which the vehicle was driven.   Penske Jaguar Land Rover ultimately agreed to cover this cost as goodwill when Mr. Freiburghouse protested.

16.    Although Mr. Freiburghouse was not charged for the above servicing and repairs, he was and continues to be damaged because he was knowingly sold a defective vehicle and has not been offered a suitable repair or replacement.  Because of the DPF Defect, Mr. Freiburghouse owns a vehicle with a DPF system that is prone to clogging and that does not provide adequate (or indeed, any) warning of the need for regeneration.

17.    At all times Mr. Freiburghouse has driven his vehicle in a foreseeable manner and in the manner in which a vehicle is typically intended to be driven.

**Defendant**

18.    Defendant, Jaguar Land Rover LLC is a limited liability company organized under the laws of the State of Delaware and registered to do business

10

throughout the United States.  Jaguar Land Rover's corporate headquarters are located at 555 Macarthur Blvd., Mahwah, New Jersey 07430.

19.     Jaguar Land Rover designees, manufactures, markets, distributes, services, repairs, sells and/or leases passenger vehicles, including the Class Vehicles, nationwide.  Jaguar Land Rover is the warrantor and distributor of the Class Vehicles in the United States.  Jaguar Land Rover vehicles are sold, leased and serviced through Defendant's network of dealers, including at over twenty Land Rover dealerships located in the states of New York and California (each).  Defendant also advertises its produces regularly, including its diesel vehicles, via television, print and digital media to the citizens of New York and California.

20.     Whenever, in this Complaint, reference is made to any act, deed or conduct of Jaguar Land Rover, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant.

### III.   JURISDICTION and VENUE

21.     This Court has subject matter jurisdiction over this class action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed the sum value of $5,000,000, exclusive of interests

and costs.  There are more than 100 Class Members.  At least one Class Member is a citizen of a different state than the Defendant.

22.     This court also has federal question jurisdiction over this action under 28 U.S.C. §1331 because Plaintiffs' claims under the Magnuson-Moss Act arise under federal law, 15 U.S.C. § 2301, et seq.  This Court has personal jurisdiction over Defendant because it's its principle place of business is located in New Jersey.

23.     Venue is proper in this District because Defendant is headquartered, and thus resides, in this District within the meaning of 28 U.S.C. §1391 and a substantial part of the acts and omissions alleged herein took place in this District, as the Class Vehicles are, were, and are regularly advertised, marketed, sold / leased and serviced in this District through Defendant's network of dealers.  Plaintiffs' counsel's Declaration of Venue, to the extent required under California Civil Code Section 1780(d), is attached hereto as Exhibit 1.

## IV.    ADDITIONAL FACTUAL ALLEGATIONS

### A.    <u>How Defendant's DPF Functions</u>

24.     Diesel particulate matter resulting from the incomplete combustion of diesel fuel produces soot (*i.e.*, black carbon) particles.  The expulsion of soot and other particles from diesel engines worsen the particulate matter pollution in the air and are harmful to the environment and health.

25.     A DPF is a device designed to remove diesel particulate matter from the exhaust gas of a diesel engine.  As exhaust travels through the filter particulate

matter particles are trapped while the exhaust gas is allowed to escape. These particles must be burnt through a combustion process called regeneration, or the DPF will become clogged.

26.   Regeneration, in turn, requires a high temperature to ensure effective combustion which is often only achieved under a high engine load. By design, therefore, regeneration may occur automatically when a vehicle is driven regularly at highway speeds for extended periods of time (i.e., in excess of twenty or thirty minutes). This process is called passive regeneration. Many common driving conditions such frequent city driving in slow moving traffic or even driving in cold weather may not provide a sufficient opportunity for passive regeneration to occur, causing particulate matter to build up in the filter. In such instances active regeneration—a process initiated by the vehicle's on-board computer to increase exhaust temperature so that the soot particles can be burnt -- is required. For the active regeneration process to be effective, the vehicle must be driven at highway speeds for an extended period of time.

27.   Although Defendant has equipped its vehicles with warning lights to alert drivers when regeneration is necessary, this system is ineffective. Defendant's DPF warning system has three lights that may appear on the display panel. An amber light indicates regeneration is required, and instructs the driver to drive at highway speeds for approximately twenty minutes. A red light indicates that the DPF is full

and instructs the driver to contact a service center.  A green light will display when regeneration is complete.  However, by the time the amber light appears the filter is often already substantially clogged and requires replacement, or will require replacement in an extremely short period of time.

28.     The DPF has a maximum capacity of approximately 31.5 grams of soot. The amber warning light is programmed to illuminated when the filter contains approximately 27 grams of soot.  Thus, the amber warning light is programmed to illuminated when the DPF is over 85% full.  Given the margin of error in soot measurement and the manner in which the DPF functions, this is far too close to full for the amber warning light to operate as a consistent, safe and effective warning system.  If regeneration is even possible by the time of an amber light warning (which it often is not), the time to regenerate the filter is far too short.

29.     The manner in which Defendant's warning system functions has severe safety implications.  As a DPF becomes clogged, exhaust fumes literally become trapped within the engine.  This impacts engine performance and will ultimately lead to complete shutdown—vehicles cannot run without a functioning exhaust system. In addition, as the fumes gather there is an increased risk of exhaust inhalation and the undercarriage of the vehicle becomes hotter, posing a greater risk of fire.

30.     To use a layman's analogy, Defendant's approach to the DPF warning light system is akin to a cardiologist whose practice is to only warn patients of a need

for intervention when an artery is dangerously blocked or almost blocked—a heart attack may well occur before the patient ever makes it to the hospital.

31.    Defendant provides conflicting and inaccurate information concerning the actions to be taken when the amber warning light flashes.  When the amber warning light illuminates in Mr. Shaaya's vehicle, it is accompanied by an instruction that directs the driver to drive above 40 miles per hour for 20 minutes. Defendant's warranty booklet for the 2018 Range Rover, and its website, state that when the amber light flashes driving above 37 mph for 20 minutes should clean the filter.  However, various TOPIx[1] documents published by Defendant to guide its dealers suggest a much higher engine load is needed for regeneration to occur.  For example, Defendant's Diagnostic Trouble Code Index for the 2018 Range Rover identifies "particulate filter regeneration conditions" as driving "70mph in 6th gear for 30 min."  A technical guide for the 2018 Range Rover published by Defendant on May 6, 2019 similarly identifies driving at approximately 70 mph in 6th gear for 30 min as DPF "regeneration conditions."   This same technical guide states elsewhere that:

> [t]he ideal speed and conditions for regeneration are 100 km/h (62 mph) – 12 km/h (75 mph), in Drive.  Keeping a constant speed enables the diesel particulate filter to regenerate more efficiently.  It is therefore recommended that cruise control is used to achieve this, if possible.

---

[1] TOPIx is Defendant's factory workshop manual system.

On information and belief, driving only 40 mph for 20 minutes may not be sufficient for regeneration to occur.

32.     Mr. Shaaya estimates that the amber warning light on his vehicle has illuminated approximately ten times since he has owned the car.  The time Mr. Shaaya has had to regenerate his vehicle (i.e. the time between an amber warning light and a red warning light) has typically ranged from fifteen minutes to one hour, and has never been longer than a few hours.  This window of time can translate to a driving distance of three or four miles in congested traffic before the amber light turns red.

33.     On more than one of these occasions, Mr. Shaaya's DPF failed to regenerate even though he followed the warning light's instructions.

34.     As one article explained: "There can be as little as a minute between the car alerting you to a problem and it going into limp home mode … In that time, and assuming you're on a clear road, you  must start the regen process, which involves driving the car at no less than 37 mph for 10 minutes with the engine turning at over 2000 rpm."[2]  In other words, by the time the warning light comes on, it is often essentially too late.

---

[2]  Getting cleaned out: diesel particulate filters 10 years on, AutoCar, https://www.autocar.co.uk/car-news/features/getting-cleaned-out-diesel-particulate-filters-10-years (Feb. 3, 2019).

35.     The DPF Defect is such a problem that Defendant has published guidance to its sales staff in Europe advising them of the challenges it presents, and advising that certain customers be encouraged to purchase other vehicles.  This document identifies various impacted models by vehicle architecture type, including the Range Rover and Range Rover Sport.  This document explains that if a customer routinely drives for less than 20 minutes at less than 40 mph, "the vehicle may continually fail to regenerate and the filter then will become blocked."  This document also notes that failed regeneration attempts can lead to oil dilution.  This document concludes as follows:

> In summary, if a customer has a diesel vehicle listed above and uses the car in a typical low-speed, low-duration drive cycle (Rural/Urban), they will suffer from oil dilution as a minimum but also in many cases will have blocked DPFs. To avoid these issues, we strongly recommend that customers should be advised to choose an equivalent petrol vehicle or an alternative JLR diesel model that supports the customer drive cycle better and minimizes their risk of having old dilution or blocked DPF filter problems.

36.     The DPF system in all Jaguar Land Rover diesel vehicles in the United States and Europe is the same or substantially similar.

## B.     Defendant's Knowledge of the DPF Defect

37.     Defendant was necessarily aware of the DPF Defect prior to sale of the Class Vehicles because it is a design defect.  By design, Defendant's DPF is prone to clog under normal driving conditions for much of the country, such as driving

17

frequently in congested urban traffic or even cold weather.  By design, a DPF-equipped vehicle must be driven at highway speeds on a regular basis for the DPF process of passive regeneration to clean the DPF automatically.  Defendant was necessarily aware of this at the time it sold the Class Vehicles, but failed to inform Plaintiffs and Class Members.  The fact that Defendant's vehicles incorporate a DPF warning system (albeit ineffective) evidences Defendant's knowledge.  Also by design, Defendant's DPF warning light system only illuminates when the DPF filter is clogged or substantially clogged.

38.    Since Defendant's introduction of diesel engine vehicles equipped with DPFs, Defendant also became aware of the DPF Defect through sources not available to Plaintiffs and Class Members, including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Defendant's network of dealers and directly to Defendant, aggregate warranty data compiled from Defendant's network of dealers, testing conducted by Defendant in response to consumer complaints, and repair order and parts data received by Defendant from Defendant's network of dealers.

39.    During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles which would necessarily have taken place prior to the sale of the Class Vehicles, Defendant, directly and/or through its

agents or affiliated companies in the supply chain, necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicle's DPF system: its capabilities including its ability to passively or actively regenerate, and the conditions required to do so; the vehicle's ability to detect when active regeneration is needed; whether the warnings given to drivers were adequate and timely; how the DPF would experience performance problems or fail; and, the cumulative and specific impacts on the DPF caused by wear and use, the passage of time, driver habits, driving patterns, environmental factors, etc.

40.    An adequate pre-release analysis of the design, engineering, and manufacture of the DPF system used for the Class Vehicles would have revealed to Defendant that it does not operate properly and is not fit for its intended use.  Thus, during the pre-release design stage of the Class Vehicles, Defendant would have known that the DPF system in the Class Vehicles was defective and would pose a safety risk to owners/lessees and the motoring public.  Defendant introduced diesel engines equipped with DPFs into its Range Rover vehicles in 2016.  Since that introduction through at least 2020, the DPF system in these vehicles has remained the same or substantially similar in all material respects.  For example, the same DPF

is indicated in dealer part listings as a vehicle fitment for Range Rover vehicles from 2016-2020.[3]

41.    As is common in the automotive industry, the design and testing process for the DPF system took many years.  By way of example, a TOPIx document for the 2017 Range Rover Sport titled "Diesel Particulate Filter – Component Location" which discusses the description and operation of the exhaust system bears the publishing date September 30, 2014.

42.    On January 11, 2015 Land Rover issued a press release touting the fuel efficient diesel powertrains in the 2016 model year Land Rover.[4]  The article describes, *inter alia*, how the exhaust gas recirculation ("EGR") system of the Land Rover takes low pressure gasses—after the DPF filter in the exhaust pipe—and feeds them back into the turbocharger inlet, resulting in a lower level of NOx emissions. In a section titled "Tested and Proven in the USA" the article discusses the extensive diesel engine testing performed by Defendant in the United States:

> Land Rover engineers embarked on US testing schedule to ensure the new diesel engine could handle all US climate and terrain conditions.  By the time US sales have begun, the test fleet will have completed one million test miles.

---

[3]  *See, e.g.*, https://parts.centurylandroverhuntsville.com/oem-parts/land-rover-diesel-particulate-filter-lr071089.

[4]  *See* Land Rover Brings Two-Luxury Diesel SUV models North America Market available at https://media.landrover.com/en-us/news/2015/01/land-rover-brings-two-luxury-diesel-suv-models-north-america-market.

> The test fleet has targeted the most extreme climates and
> diverse terrains imaginable across the US.  The new
> Range Rover and Range Rover Sport diesel have
> navigated from sea level to altitudes of 14,000 feet during
> the grueling test program.  To meet unique demands of
> the North American climate, engineers have undertaken
> testing year round, from the coldest winter days in
> Minnesota, to summertime in the deserts of the
> Southwest.

Surely such testing would have alerted Defendant to the fact that it's DPF's are
prone to clog under various driving conditions, and that the DPF's warning light
system is inadequate.

43.     In an August 2016 article, Jaguar boasts that "Throughout each stage of
design, development and production, every component of a Jaguar goes through
thousands of tests and checks for safety, durability and quality, ensuring that the
finished product is the most reliable, dependable and safest car you can drive."[5]  The
article goes on to detail the grueling physical testing to which vehicles are subjected:

> Although virtual engineering is a powerful tool, there's
> no substitute for physical testing in a laboratory
> environment as the ultimate proof of concept for
> reliability and durability. We have doubled the size of our
> structural test facilities in recent years, with a £22m
> investment to further enhance our state-of-the-art labs.
>
> New transmission designs go through a continuous 12-
> week rig test, simulating a 10-year 240,000 kilometre
> cycle that includes town driving, high-speed highway
> driving and track driving. This is repeated six times for
> different engine and transmission variants, meaning that
> every new gearbox is tested for 72 weeks and 1.45 million
> kilometres – the equivalent of driving to the moon and

---

[5] *See* https://www.jaguar.com/about-jaguar/reliability/testing-process.html

back. There are also shift cycle tests that put the clutch through a gruelling series of high-speed shifts, and steady-state tests where the transmission is run at high levels of torque for long periods.

Our engines have their own comprehensive suite of static rig and dynamometer tests, with the new generation of Ingenium engines having gone through 72,000 hours of durability testing – equivalent to eight years of real-world tests – before they hit the road for two million kilometres of final validation testing.

Individual components can be tested in the Environmental Robotic Durability Cell, which uses four robots, which can be used to test everything from seatbelt activation and release, door opening and closing, and key turns. Vehicle noise, vibration and harshness qualities are also refined in advanced anechoic sound chambers.

Climate Chambers replicate the world's toughest weather conditions, freezing cars to -40ºC in hurricane-strength winds, or replicating the sort of +50ºC temperatures and solar loads of up to 1,200W/m2 that you'd expect in the Sahara desert  – all without vehicles ever having to leave the UK. Water-tightness is proven with monsoon soak tests, drizzle tests that last up to 16 hours, and freeze tests.

Physical laboratory testing even extends to interior features such as the rotary JaguarDrive Selector, which was subject to every abuse imaginable during its development. "A bottle of cola is a tough test, as the sugar turns to treacle in hot climates," says Julian Jones, User Controls Manager. "Sand can also be bad if it gets in the DriveSelector's gears." Each test takes a month to run, with the DriveSelector having to cycle 60,000 times without fault.

Surely such testing would similarly have placed Defendant on notice of the DPF Defect.

44.     Defendant also would have known about the DPF Defect because of the higher than expected number of replacement exhaust filters ordered from Defendant, which should have alerted Defendant that the DPF system was defective. Defendant's service centers use Defendant's replacement parts that they order directly from Defendant. Therefore, Defendant would have detailed and accurate data regarding the number and frequency of replacement part orders, including replacement exhaust filters. The ongoing high sales of replacement exhaust filters was known to Defendant, and would have alerted Defendant that its DPF system was defective and posed a safety risk early on.

45.     Defendant also knew about the DPF Defect because numerous consumer complaints regarding DPF replacements were made directly to Defendant. The large number of complaints, and the consistency of their descriptions of DPF defect alerted Defendant to this serious Defect affecting the Class Vehicles. The full universe of complaints made directly to Defendant about the DPF Defect is information presently in the exclusive custody and control of Defendant and is not yet available to Plaintiffs prior to discovery. However, upon information and belief, many Class Vehicle owners complained directly to Defendant and Defendant's dealerships and service centers about the repeated need for exhaust filter replacements that their vehicles experienced.

46.     Defendant also knew about the DPF Defect because the Defect because Defendant has been provided by its dealers with documentation of DPF failures for years in connection with consumer warranty claims and actual or threatened lemon law litigation.  When DPF-related work is performed under warranty, dealers must send documentation of the work Defendant for reimbursement.  Dealers also regularly ask Defendant for authorization to perform DPF-related warranty repairs, as was the case with Mr. Shaaya.  Defendant is also provided with repair orders and related documentation for DPF-related work in connection with actual or threatened lemon law litigation.

47.     For example, Confidential Witness ("CW") 1 is the former owner of a 2016 Range Rover.  CW 1 brought his vehicle in for dealer servicing multiple times during the period November 2016 through April of 2017 for DPF-related issues.  On or about November 11, 2016 with only 980 miles on the odometer, CW 1 brought his vehicle to the dealer which found one or more DTCs indicating a high DPF soot load, and a regeneration was performed under warranty.  On or about January 16, 2017 with 2,293 miles on the odometer, CW 1 brought his vehicle to the dealer complaining his DPF was full again, and another regeneration was performed under warranty.  On or about February 11, 2017 with 2,309 miles on the odometer, CW 1 returned to the dealer with a full DPF, and this time had his DPF replaced under warranty.  On or about March 13, 2017 with 3,073 miles on his odometer, CW 1

returned to the dealer once again with a full DPF and the dealer replaced the DPF pressure sensor under warranty and performed another regeneration. On or about March 28, 2017, CW 1, acting through counsel, sent Defendant a demand letter pursuant to various state and federal warranty laws, with repair orders attached.

48.    CW 2 is the former owner of a 2016 Range Rover who also made multiple dealer complaints concerning his DPF system during his period of ownership. On or about January 6, 2016 with 1,365 miles on the odometer, CW 2 brought his vehicle to the dealer complaining that there was smoke coming from his tailpipe and a heavy odor of fuel inside the cabin. The vehicle was diagnosed to have a high DPF soot load and a DPF regeneration was performed under warranty. On or about January 28, 2016 with 1,990 miles on the odometer, CW 2 brought his vehicle back to the dealer reporting that his amber DPF warning light had illuminated, and that he immediately shut his vehicle off then came straight to the dealer (at which point the light was red). The vehicle was again diagnosed to have a high DPF soot load and another regeneration was performed under warranty. On or about April 18, 2016 with 4,527 miles on the odometer, CW 2 brought his vehicle back to the dealer complaining that his diesel exhaust fluid ("DEF") was low, and the dealer topped off the fluid. On or about September 7, 2016 with 9,449 miles on the odometer, CW 2 returned to the dealer with the DEF message again on, and the system fluid was refilled. On or about February 18, 2017 with 15,266 miles on the

odometer CW2 again returned to the dealer with the DEF message on again, and fluid was added to the vehicle.  On September 27, 2017 with 27,561 miles on the odometer CW 2 returned to the dealer with his check engine light on, and the vehicle was diagnosed to have a high DPF soot load, and a regeneration was performed. Service records for this visit state "CUSTOMER NEED TO DRIVE VEHICLE ON H/WAY FOR 50 MILE FOR 30 MIN."  On or about January 10, 2018, CW 2, acting through counsel, sent Defendant a demand letter pursuant to various state and federal warranty laws, with repair orders attached

49.     CW 3 is the former owner of a 2016 Range Rover who also experienced ongoing DPF system issues during his period of ownership.  On or about June 14, 2016 with 7,843 miles on the odometer, CW 3 receive a diesel fluid message and brought his vehicle to the dealer, who added diesel fluid under warranty.  On or about November 11, 2016 with 14,838 miles on the odometer, CW 3 again received a diesel fluid message and brought his vehicle to the dealer who added diesel fluid for which CW 3 paid $433.60 out-of-pocket.  On or about January 2, 2018 with 36,601 miles on the odometer, CW 3 brought the vehicle to the dealer with the engine light on and the dealer proceeded to replace the DPF at a cost of $5,329.59.  On or about April 23, 2018, CW 3 brought his vehicle to the dealer and it was again diagnosed to have a high DPF soot load, and the dealer performed a regeneration. On or about February 2, 2018, CW 3, acting through counsel, sent Defendant a

demand letter pursuant to various state and federal warranty laws, with repair orders attached.

50.     Defendant also knew about the DPF Defect from a number of public complaints, and articles complaining of the DPF Defect, posted on the Internet and elsewhere.  By way of example on March 30, 2017, AOL published an article titled "Furious Range Rover owner vandalises his own car."[6]  In relevant part the article explained that:

> Dev Bath, 30, paid more than £70,000 for the black Range Rover Sport, and has threatened to burn it live on camera if manufacturer Land Rover fails to sort out its alleged issues.
>
> He ditched the SUV in a Mayfair street on Tuesday, and claims Land Rover has repeatedly asked him to remove the vehicle as it is 'damaging its brand'.
>
> One of the messages Bath left on the car reads: 'Be careful, don't buy from Range Rover. I got ripped off. They sold me this junk.'
> . . .
> 'I've only had it for 10 months and we've had nothing but problems. We had had it for six weeks when the yellow

---

[6] Furious Range Rover owner vandalises his own car, AOL, *available at* https://www.aol.co.uk/cars/2017/03/30/furious-range-rover-owner-vandalises-his-own-car/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAMGKzPXJAZKWcJEFQ7_yryLVEPmE0_Fkbsj9EKvfcvSGNDwOkEw8qE9GBe44vhI6ecbHTXHlaBa-HRgfS9vOoBKPndXzjByenvnqGCb40l2lTaPtDfkV6_rB94Ynbcuy68L-CBMsSgXLymREHd8CS7n_2wstvGFIWTXozi4dj9mN (Mar. 30, 2017).

> light first came on saying I had to drive the car for thirty
> minutes at 50mph.'

> "No-one told me this when I bought the car. Where can
> you do that in London? Range Rover haven't done
> anything to help me so I thought what better place to park
> it than on Berkley Street in Mayfair?'

*Id.* The article concluded by a Land Rover spokeswoman commenting that:

> The customer is complaining of a full DPF (Diesel
> Particulate Filter) owing to the urban cycle the vehicle
> has been used on, which would be the case in any diesel
> with a DPF. There is no fault with the vehicle. Land
> Rover is trying to work with the customer to bring the
> situation to a mutually satisfactory conclusion.

*Id.* Therefore, by March of 2017, Jaguar Land Rover was aware of DPF Defect, but refused to acknowledge the Defect or offer an adequate fix, instead blaming the customer's driving style.

51. One Land Rover owner reported bringing his vehicle in to his dealer for DPF regeneration an astounding 20 times.[7] This vehicle owner has reported the following partial list of service call outs to Land Rover assist for his vehicle's DPF issues for the period June 2016 through June 2018[8]:

---

[7] *See* Land Rover DPF Problems, available at https://www.rangeroverdpf.com/ (last visited Aug. 28, 2020).

[8] Distortion of registration number in document as posted by owner.

| DATE | REGISTRATION | VEHICLE MAKE | FAULT |
|---|---|---|---|
| 06/04/2016 | YH65 | Range Rover | Warning Light Red – DPF |
| 09/11/2016 | YH65 | Range Rover | Warning Light Red – DPF Filter Full |
| 25/12/2016 | YH65 | Range Rover | Warning Light Orange (JLR) |
| 04/03/2017 | YH65 | Range Rover | Warning Light Red (JLR) |
| 23/04/2017 | YH65 | Range Rover | Warning Light Orange (JLR) |
| 09/05/2017 | YH65 | Range Rover | Warning Light Orange – DPF |
| 20/05/2017 | YH65 | Range Rover | Warning Light Red – DPF |
| 26/07/2017 | YH65 | Range Rover | Warning Light Orange (JLR) |
| 10/09/2017 | YH65 | Range Rover | Diesel Particulate Filter (DFP) - Fault |
| 02/10/2017 | YH65 | Range Rover | Diesel Particulate Filter (DFP) – Warning Light On |
| 22/11/2017 | YH6 | Range Rover | Locks – Central Locking (JLR) |
| 22/11/2017 | YH6 | Range Rover | Keyless Entry (Prestige) |
| 09/12/2017 | YH6 | Range Rover | Warning Light Orange (JLR) |
| 06/01/2018 | YH6 | Range Rover | Diesel Particulate Filter (DFP) – Warning Light On |
| 17/11/2018 | YH6 | Range Rover | Diesel Particulate Filter (DFP) – Warning Light On |
| 06/04/2018 | YH65 | Range Rover | Warning Light Orange (JLR) |

52.     An online forum concerning DPF-related issues contains over one hundred comments from Jaguar Land Rover vehicle owners for the time period September 2017 through the present.[9]  This forum contains the following posts, for example:

**<u>Posted by Jackie Walsh September 11, 2017</u>**

> I raised a complaint about my new car, a Range Rover Evoque, purchased in March 2017.  This vehicle although brand new went in for repair on the 19/6/2017 for a DPF (diesel particulate filter) fault and regeneration. I was told by the recovery technician that it was the way I drive it. This was despite me telling him my previous car was also a Range Rover Evoque owned from new that I had for 3 years driven in the same way and mileage with service records to support this but never encountering this

---

[9] *See* Mis-Sold Diesel with DPF Problems, The Car Expert, *available at* https://www.thecarexpert.co.uk/forums/topic/miss-sold-diesel-with-dpf-problems/ (last visited Aug. 28, 2020).

problem. I was given no advice or explanation when I collected my car.

Less than 8 weeks later the same fault occurred. This is the 2nd fault in a 5-month-old car and I contacted the dealer and the manufacturer to reject the vehicle

### Posted by Iftikar, April 13, 2018

Hi, my wife took delivery (on contract hire) of a new diesel manual Evoque in December 2016 (replacing an existing diesel manual Evoque she had for 4 years). Within 2 weeks of driving the car developed a fault i.e. reduced performance, dealer took it in for repair since the first fault the Evoque has now been in for repair 7 times in 12 months and been off the road for 192 days in the year!

### Posted by Single Barrel, April 28, 2018

Such an interesting thread. I have a Range Rover Sport which I bought new on a 65 plate. I have had no less than 19 breakdowns with the car spending weeks on end in the workshop. As always been told it's my driving style even though the dpf light comes on every 150 miles. I was given a Vogue as a courtesy car with the same SDV6 engine. I had the car for 10 weeks and covered 4000 miles without a single DPF fault.

Escalated to the executive office and spoke to Lorraine Brookes who was useless, knows nothing about Land Rover products, and offered a meal for 2 as a gesture of good will. Now in the process of pursuing JLR through the courts.

I have created a basic blog at http://www.rangeroverdpf.com detailing my problems. Please share and distribute on social media as JLR will not help these customers until they start losing sales as a result.

Their conduct and attitude towards customers with these DPF issues is disgusting.

**Posted by Keeven, October 12, 2018**

I have my Discovery Sport for 16 months and have sent it to the dealer several times because of the DPF warning. This time the DPF amber warning was on again. I didn't do the regeneration that day because I was busy. The next day the warning turned red directly. I called JLR road assistance, the guy came and diagnosed. He reckoned the amber warning period is too short to take action. I sent my car to the dealer. After a few days, the dealer called me today, telling me they have replaced the DPF, and asking where I normally drive. I told him I mainly drive in the town. Then he said because of my driving style, although the car is under warranty, I have to pay for replacing the DPF, which is nearly 1400 pounds!

I said I mainly drive in the town, but do 100miles journey on motorway every 1 or 2 weeks. And in the week before the warning light was on, I did two motorway journeys. The dealer just keep say it is my driving style fault, I have to pay. It just pissed me off.

If JLR can't make a car to suit all the driving style, Why JLR's never mentioned the driving style limitation in their ad? This car is definitely not for town driving.

53. Notwithstanding its longstanding knowledge of the DPF Defect, Defendant has actively concealed the Defect, failed to disclose the Defect to its customers prior to or at the time of purchase of their vehicles, and failed to provide a remedy for the DPF Defect to date.

54. Customers have reported the DPF Defect in the Class Vehicles to Defendant directly and through its dealers. Indeed, when Plaintiff Shaaya informed Land Rover Manhattan about his DPF Defect, the service representative informed him that this was a common problem and that the dealership would only be selling

diesel vehicles in 2019 on special request to limit the number of diesels sold because the problems were costing the dealership too much time.

55.     Defendant is fully aware of the DPF Defect contained in the Class Vehicles.  Nevertheless, Defendant actively concealed the existence and nature of the DPF Defect from Plaintiffs and the other Class Members at the time of purchase or repair and thereafter.  Specifically, Defendant:

      a.     failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the DPF Defect;

      b.     failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles and their DPFs were not in good working order, were defective, and were not fit for their intended purpose; and,

      c.     failed to disclose and/or actively concealed the fact that the Class Vehicles and their DPFs were defective, despite the fact that Defendant learned of the DPF Defect prior to releasing its vehicles equipped with diesel engines, and prior to Plaintiff's purchase of his vehicle.

56.     Defendant has deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to expend money at its dealerships or other third-party repair facilities and/or take other remedial measures related to the DPF Defect contained in the Class Vehicles.

57.     Defendant has not recalled the Class Vehicles to repair the DPF Defect, has not offered to its customers a suitable repair or replacement of parts related to the DPF Defect free of charge, and has not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the DPF Defect.

58.     Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

59.     As a result of the DPF Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles. Reasonable consumers, like Plaintiffs, expect and assume that a vehicle's DPF and related components are not defective and will not malfunction while operating the vehicle as it is intended.  Plaintiffs and Class Members further expect and assume that Defendant will not sell or lease vehicles with known safety defects, such as the DPF Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable repair or non-defective replacement.

## C.     <u>Tolling of the Statute of Limitations</u>

60.     Plaintiffs and the other Class Members were not reasonably able to discover the DPF Defect, despite their exercise of due diligence.

61.     Despite their due diligence, Plaintiffs and the other Class Members could not reasonably have been expected to learn or discover that they were deceived

33

and that material information concerning the Class Vehicles and their DPF systems was concealed from them.

62.    In addition, even after Class Members contacted Defendant and/or its authorized agents for vehicle repairs concerning the defective nature of the Class Vehicles and their DPFs, they were routinely told by Defendant and/or through their authorized agents for vehicle repairs that the Class Vehicles are not defective.

63.    Hence, any applicable statute of limitation, if any, has been tolled by Defendant's knowledge, active concealment, and denial of the facts alleged herein.

## V.    CLASS ACTION ALLEGATIONS

64.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class and Sub-Classes pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

65.    The Class and Sub-Classes are defined as follows:

> **Nationwide Class:** All persons who purchased or leased a diesel engine-powered 2016-2020 Land Rover Range Rover or other diesel engine-powered Jaguar Land Rover vehicle equipped with a substantially similar DPF system within the United States.

> **New York Sub-Class:** All persons who purchased or leased a diesel engine-powered 2016-2020 Land Rover Range Rover or other diesel engine-powered Jaguar Land Rover vehicle equipped with a substantially similar DPF system within the State of New York.

34

**California Sub-Class:** All persons who purchased or leased a diesel engine-powered 2016-2020 Land Rover Range Rover or other diesel engine-powered Jaguar Land Rover vehicle equipped with a substantially similar DPF system within the State of California.

66.     Excluded from the Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiffs reserve the right to amend the Class and Sub-Class definitions, and to add subclasses, if discovery and further investigation reveal that the Class and Sub-Classes should be expanded or otherwise modified.

67.     **Numerosity**: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  The Class Members are readily identifiable from, *inter alia*, information and records in Defendant's possession, custody, or control.

68.     **Typicality**: The claims of the representative Plaintiffs are typical of the claims of the Class and Sub-Classes in that the representative Plaintiffs, like all Class Members, paid for a Class Vehicle designed, manufactured, and distributed by Defendant which is subject to the DPF Defect.  The representative Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that they have

incurred or will incur the cost of repairing or replacing a defective or full DPF. Further, the factual bases of Defendant's misconduct are common to all Class Members and represent a common thread of fraudulent, deliberate, and/or grossly negligent misconduct resulting in injury to all Class Members.

69.    **Commonality:** There are numerous questions of law and fact common to Plaintiffs and the Class and Sub-Classes that predominate over any question affecting only individual Class Members.  These common legal and factual questions include the following:

a.    whether the Class Vehicles suffer from the DPF Defect;

b.    whether the DPF Defect constitutes an unreasonable safety hazard;

c.    whether the defective nature of the Class Vehicles' DPF system constitutes a material fact;

d.    whether Defendant had and has a duty to disclose the defective nature of the Class Vehicles' DPF system to Plaintiffs and the other Class Members;

e.    whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

f.    whether Defendant knew or reasonably should have known of the DPF Defect contained in the Class Vehicles before it sold or leased them to Class Members; and

g.    Whether Defendant:  (1) violated New York's General Business Law for Deceptive Acts or Practices § 349; (2) breached the express warranty (N.Y. U.C.C. § 2-313); (3) breached the implied warranty of merchantability (N.Y. U.C.C. §2-314); (4) committed common law fraudulent omission; (5) breached the implied and written warranties under the Magnuson-Moss Warranty Act (15 U.S.C. §2301, *et seq.*); (6) was unjustly enriched; (7) violated California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA"); (8) breached the express warranty, Cal. Com. Code § 2313; and (9) breached the of implied warranty of merchantability pursuant to California Song-Beverly Consumer Warranty Act (Cal. Civ. Code §§ 1792 and 1791.1, *et seq.*) and Cal. Comm. Code § 2314.

70.    **Adequate Representation**:  Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

71.    **Predominance and Superiority:**  Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of

Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

## VI.    CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF NEW YORK'S GENERAL BUSINESS LAW FOR DECEPTIVE ACTS OR PRACTICES § 349 ("N.Y. GBL")**
**(On behalf of the Nationwide Class or, in the Alternative, on behalf of the New York Sub-Class)**

72.    Plaintiff Daoud Shaaya incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

73.    Plaintiff Daoud Shaaya brings this cause of action on behalf of himself and the Nationwide Class, or in the alternative, the New York Sub-Class.

74.    Plaintiff and Class Members are "persons" within the meaning of N.Y. GBL § 349(h).

75.    The N.Y. GBL § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  Defendant's conduct, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL § 349.  Furthermore, Defendant's deceptive acts and practices, which were intended to mislead consumers who were in the process of purchasing and/or leasing the Defective Vehicles, constitute conduct directed at consumers.

76.    Defendant knew that the Class Vehicles' suffered from the DPF Defect, as described herein.

77.    In failing to disclose the DPF Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so, thereby engaging in deceptive acts or practices within the meaning of the N.Y. GBL § 349.

78.    Defendant was under a duty to Plaintiff and the other Class Members to disclose the defective nature of the Class Vehicles' DPFs because:

a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' DPF system;

b.    Plaintiff and the Class Members could not reasonably have been expected to learn or discover that their DPF systems were defective until after they purchased the Class Vehicles;

c.      Defendant knew that Plaintiff and Class Members could not reasonably have been expected to learn about or discover the DPF Defect; and

d.      Defendant actively concealed the defective nature of the Class Vehicles' DPF system from Plaintiff and Class Members at the time of sale and thereafter.

79.     The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them.

80.     Defendant continued to conceal the defective nature of the Class Vehicles and their DPFs even after Class Members began to report problems. Indeed, Defendant continues to cover up and conceal the true nature of this systematic problem today.

81.     Plaintiff also asserts a violation of public policy arising from Defendant's withholding of material safety facts from consumers.  Defendant's violation of consumer protection and unfair competition laws resulted in harm to consumers.

82.     Defendant's omissions of material facts, as set forth herein, also constitute deceptive acts or practices because they violate consumer protection laws, warranty laws and the common law as set forth herein.

40

83.    Thus, by its conduct, Defendant has engaged in deceptive acts or practices within the meaning of the N.Y. GBL § 349.

84.    Defendant's deceptive acts or practices occurred repeatedly in Defendant's trade or business, and were capable of deceiving a substantial portion of the purchasing public.

85.    As a direct and proximate result of Defendant's deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages. Had Plaintiff and other Class Members known that the Class Vehicles suffered from the DPF Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.  Moreover, Plaintiff and Class Members have had to pay out of pocket expenses to repair the DPF Defect.

86.    Since Defendant's willful and knowing conduct caused injury to Plaintiff and Class Members, Plaintiff seeks recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, and an order enjoining Defendant's deceptive conduct, and any other just and proper relief available under N.Y. GBL § 349.

## COUNT II

### BREACH OF EXPRESS WARRANTY N.Y. U.C.C. § 2-313
### (On behalf of the Nationwide Class or, in the Alternative,
### on behalf of the New York Sub-Class)

87.     Plaintiff Daoud Shaaya incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

88.     Plaintiff Daoud Shaaya brings this cause of action on behalf of himself and the Nationwide Class, or in the alternative, the New York Sub-Class.

89.     Defendant provided all purchasers and lessees of the Class Vehicles with the NVLW described herein, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under New York law.

90.     In NVLW, Defendant expressly warranted that it covered "defects in factory-supplied materials or factory workmanship." Defendant's NVLW provided 48 months/50,000 miles Basic Coverage and 96 months/80,000 miles Emissions Coverage.  Plaintiff's vehicle is within the mileage and durational limits of both of these coverage periods.

91.     Defendant breached the express warranty through the acts and omissions described above.

92.     Plaintiff was not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty

would have been futile.  Defendant was on notice of the DPF Defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the Class Vehicles' DPFs, and through other internal sources. Nevertheless, in connection with Plaintiff's November 2018 repair and request for warranty coverage, Defendant's customer relations department was contacted and placed on direct notice of Plaintiff's claim.

93.    As a result of Defendant's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles have suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the DPF Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles DPFs are substantially certain to fail before their expected useful life has run.

94.    As a result of Defendant's breach of the express warranty, Plaintiff and Class Members are entitled to legal and equitable relief against Defendant, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

95.    In addition, with respect to Class Members whose vehicles failed after the expiration of the applicable warranty period and were repaired within  reasonable time thereafter, the durational limits of the warranty are unconscionable pursuant to New York Uniform Commercial Code Sec. 2-302(1) and (2), because as alleged

herein, Defendant was aware of the basic defects in the DPF system prior to selling or leasing the Class Vehicles and knew or should have known that the Class Vehicles suffered from the DPF Defect, but concealed or intentionally failed to reveal this information to Class Members in order to cause them to wait until after the warranty period to seek repairs.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY N.Y. U.C.C. § 2-314
### (On behalf of the Nationwide Class or, in the Alternative, the New York Sub-Class)

96.     Plaintiff Daoud Shaaya incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

97.     Plaintiff Daoud Shaaya brings this cause of action on behalf of himself and the Nationwide Class or, in the alternative, the New York Sub-Class.

98.     Class Vehicles are "goods" and Plaintiff and members of the Nationwide Class and New York Sub-Class are "buyers" within the meaning of §§ 2-103, 2-104, 2-105.  Defendant is also a "seller" "merchant," or "retail seller" under §§ 2-103-and 2-104.

99.     Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or merchantor of the Class Vehicles.  Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased.

100.   Defendant provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because the Class Vehicles suffer from a DPF Defect that can make driving unreasonably dangerous.

101.   Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles' designed, manufactured, supplied, distributed, and marketed by Defendant were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles' DPF would be fit for their intended use while the Class Vehicles were being operated.

102.   Contrary to the applicable implied warranties, the Class Vehicles, at the time of sale or lease and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and the other Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, as described more fully above.

103.   Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of U.C.C. § 2-314 *et. seq.*

45

**COUNT IV**

**FRAUDULENT OMISSION**
**(On behalf of the Nationwide Class or, in the Alternative, on behalf of the New York and California Sub-Classes)**

104.   Plaintiffs Dayoud Shaaya and Mark Freiburghouse incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

105.   Plaintiffs Dayoud Shaaya and Mark Freiburghouse bring this cause of action on behalf of themselves, the Nationwide Class, or in the alternative, the New York and California Sub-Classes.

106.   Defendant knew that the Class Vehicles' front DPF were defectively designed and/or manufactured, would fail, and were not suitable for their intended use.

107.   Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles and their DPFs.

108.   Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles' front DPF because:

a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' DPF system;

b.   Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that their DPF systems were defective until after they purchased the Class Vehicles;

c.      Defendant knew that Plaintiffs and Class Members could not reasonably have been expected to learn about or discover the DPF Defect; and

d.      Defendant actively concealed the defective nature of the Class Vehicles' DPF system from Plaintiffs and Class Members at the time of sale and thereafter.

109.   The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles' DPF systems, they would not have purchased or leased the Class Vehicles, or would have paid less for them.

110.   Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defect(s) contained in the Class Vehicles' DPF system in order to induce Plaintiffs and Class Members to act thereon.  Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of Defendant's defective Class Vehicles.

111.   Defendant continued to conceal the defective nature of the Class Vehicles' DPF even after Class Members began to report problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

112.   As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages.

## COUNT V

## BREACH OF IMPLIED AND WRITTEN WARRANTIES UNDER MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301 *et seq.* (On behalf of the Nationwide Class or, in the Alternative, on behalf of the New York and California Sub-Classes)

113.   Plaintiffs Dayoud Shaaya and Mark Freiburghouse incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

114.   Plaintiffs bring this cause of action on behalf of themselves, the Nationwide Class, or in the alternative, the New York and California Sub-Classes.

115.   Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

116.   Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

117.   The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

118.   Defendant's implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

119.   Defendant's express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

120.   Defendant breached the implied warranty and the express warranty by virtue of the above-described acts.

121.   Plaintiffs and the other Class Members notified Defendant of the breach within a reasonable time and/or were not required to do so.  Defendant was also on notice of the DPF Defect from, among other sources, Defendant's extensive pre-release testing, complaints from Class Members and dealer requests/feedback.

122.   Defendant's breach of the implied and express warranties deprived Plaintiffs and Class Members of the benefits of their bargains.

123.   As a direct and proximate result of Defendant's breach of the implied and express warranties, Plaintiffs and the other Class Members sustained damages and other losses in an amount to be determined at trial.  Defendant's conduct damaged Plaintiffs and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorney fees and/or other relief as appropriate.

**COUNT VI**

**UNJUST ENRICHMENT**
**(On behalf of the Nationwide Class or, in the Alternative,**
**on behalf of the New York and California Sub-Classes)**

124.   Plaintiffs Daoud Shaaya and Mark Freiburghouse incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

125.   Plaintiffs Daoud Shaaya and Mark Freiburghouse bring this cause of action on behalf of themselves and the Nationwide Class or, in the alternative, the New York and California Sub-Classes.

126.   As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles.  Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

127.   Additionally, as a direct and proximate result of Defendant failure to disclose the DPF Defect in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

128.   Defendant has been unjustly enriched due to the known DPF Defect in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendant profits when said money should have remained with Plaintiffs and Class Members.

129.   As a result of Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

## COUNT VII

## VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750 *et seq.*
### (On behalf of the Nationwide Class or, in the Alternative, the California Sub-Class)

130.   Plaintiff Mark Freiburghouse hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

131.   Plaintiff brings this cause of action on behalf of himself and the Nationwide Class or, in the alternative, the California Sub-Class.

132.   Defendant is a "person" as defined by California Civil Code § 1761(c).

133.   Plaintiff and the other Class Members are "consumers" within the meaning of California Civil Code § 1761(d).

134.   By failing to disclose and concealing the DPF Defect from Plaintiff and prospective Class Members, Defendant violated California Civil Code § 1770(a), as it represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.  *See* Cal. Civ. Code §§ 1770(a)(5), (7) & (9).

135.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

136.   Defendant knew that the Class Vehicles' suffered from the DPF Defect, as described herein.

137.   Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles' front DPF because:

a.      Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' DPF system;

b.      Plaintiff and the Class Members could not reasonably have been expected to learn or discover that their DPF systems were defective until after they purchased the Class Vehicles;

c.      Defendant knew that Plaintiff and Class Members could not reasonably have been expected to learn about or discover the DPF Defect; and

d.      Defendant actively concealed the defective nature of the Class Vehicles' DPF system from Plaintiff and Class Members at the time of sale and thereafter.

138.   The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.  Had Plaintiff and other Class Members known about the DPF Defect, they would not have purchased the Class Vehicles or would have paid less for them.

139.   Plaintiff and the other Class Members are reasonable consumers who do not expect that their vehicles will suffer from a DPF Defect.  That is the reasonable and objective consumer expectation for vehicle.

140.   As a direct and proximate result of Defendant's unfair or deceptive acts and practices, Plaintiff and the other Class Members have been harmed and have suffered and will continue to suffer actual damages in that the Class Vehicles and their DPF systems are defective and repeatedly fail requiring serial repairs or replacements, and are worth less than they would be if they had a non-defective vehicle.

141.   By a letter dated August 28, 2020, sent via certified mail concurrently with the filing of this complaint, Plaintiff provided Defendant with notice of its alleged violations of the CLRA pursuant to California Civil Code Section 1782(a) and demanded that Defendant rectify the problems associated with the behavior detailed above.  If Defendant fails to agree to Plaintiff's demands within thirty (30) days of the receipt of Plaintiff's letter, Plaintiff will seek leave to amend to seek damages.

142.   Accordingly, Plaintiff seeks an order enjoining the acts and practices described above, as well as any other equitable relief available pursuant to the CLRA.

## COUNT VIII

## VIOLATIONS OF THE UNFAIR COMPETITION LAW, CAL. BUS. & PROF. Code § 17200 *et seq.*
## (On behalf of the Nationwide Class or, in the alternative, the California Sub-Class)

143.   Plaintiff Mark Freiburghouse hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

144.   Plaintiff brings this cause of action on behalf of himself and the Nationwide Class or, in the alternative, the California Sub-Class.

145.   California Business & Professions Code Section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

146.   Defendant knew that the Class Vehicles' suffered from the DPF Defect, as described herein.

147.   In failing to disclose the DPF Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so, thereby engaging in a fraudulent business act or practice within the meaning of the UCL.

148.   Defendant was under a duty to Plaintiff and the other Class Members to disclose the DPF Defect because:

a.   Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

b.     Plaintiff and the Class Members could not reasonably have been expected to learn or discover that their Class Vehicles have a dangerous safety defect until after they purchased the Class Vehicles;

c.     Defendant knew that Plaintiff and the Class Members could not reasonably have been expected to learn about or discover the DPF Defect; and

d.     Defendant actively concealed the defective nature of the Class Vehicles' from Plaintiff and Class Members at the time of sale and thereafter.

149.   The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them.  Had Plaintiff and other Class Members known that the Class Vehicles suffered from the DPF Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

150.   Defendant continued to conceal the defective nature of the Class Vehicles and their DPF even after Class Members began to report problems.  Indeed, Defendant continues to cover up and conceal the true nature of this systematic problem today.

151.   Defendant's omissions of material facts, as set forth herein, also constitute "unfair" business acts and practices within the meaning of the UCL, in

that Defendant's conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous. Plaintiff is informed and believe, and based thereon allege, that despite its knowledge of the DPF Defect, Defendant rolled out the Class Vehicles without disclosing the problem to meet its own internal schedules and revenue goals. The utility of this self-serving conduct, which only benefits Defendant and serves no public good, is greatly outweighed by the gravity of the potential harm to consumers. Plaintiff also asserts a violation of public policy arising from Defendant's withholding of material safety facts from consumers. Defendant's violation of consumer protection and unfair competition laws resulted in harm to consumers.

152. Defendant's omissions of material facts, as set forth herein, also constitute unlawful business acts or practices because they violate consumer protection laws, warranty laws and the common law as set forth herein.

153. Thus, by its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

154. Defendant's unfair and deceptive acts and practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

155.   As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages.

156.   Defendant has been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to sections 17203 and 17204 of the Business & Professions Code.

## COUNT IX

**BREACH OF EXPRESS WARRANTY, CAL. COM. CODE § 2313**
**(On behalf of the Nationwide Class or, in the alternative, the California Sub-Class)**

157.   Plaintiff Mark Freiburghouse hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

158.   Plaintiff brings this cause of action on behalf of himself and the Nationwide Class or, in the alternative, the California Sub-Class.

159.   Defendant provided all purchasers and lessees of the Class Vehicles with the NVLW described herein, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under California law.

160.   In NVLW, Defendant expressly warranted that it covered "defects in factory-supplied materials or factory workmanship." Defendant's NVLW provided 48 months/50,000 miles Basic Coverage and 96 months/80,000 miles Emissions

Coverage. Plaintiff's vehicle is within the mileage and durational limits of both of these coverage periods.

161. Defendant breached the express warranty through the acts and omissions described above.

162. Plaintiff was not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was on notice of the DPF Defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the Class Vehicles' DPFs, and through other internal sources.

163. As a result of Defendant's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles have suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the DPF Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles DPFs are substantially certain to fail before their expected useful life has run.

164. As a result of Defendant's breach of the express warranty, Plaintiff and Class Members are entitled to legal and equitable relief against Defendant, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT X

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY PURSUANT TO SONG-BEVERLY CONSUMER WARRANTY ACT, CAL. CIV. CODE §§ 1792 AND 1791.1 *et seq.*
### (On behalf of the Nationwide Class or, alternatively, the California Sub-Class)

165.   Plaintiff Mark Freiburghouse hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

166.   Plaintiff Mark Freiburghouse brings this cause of action on behalf of himself and the Nationwide Class or, alternatively, the California Sub-Class.

167.   Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased.

168.   Defendant provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because the Class Vehicles suffer from a DPF Defect that can make driving unreasonably dangerous.

169.   Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles' designed, manufactured,

supplied, distributed, and merchanted by Defendant were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles' DPF would be fit for its intended use while the Class Vehicles were being operated.

170.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale or lease and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiff and the other Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, as described more fully above.

171.   Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code sections 1792 and 1791.1, and California Commercial Code section 2314.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, requests that the Court enter judgment against Defendant, and issue an order providing the following relief.

## AS TO THE CLASS CLAIMS

a.   That Defendant provide notice, in a form pre-approved by the counsel identified below, to all Class Members, and in the said notice offer to

replace the defective DPF system contained in every Class Vehicle with a non-defective DPF system;

b.    That Defendant provide notice, in a form pre-approved by the counsel identified below, to all Class Members, and in the said notice extend the warranty for the Class Vehicles' DPF system as appropriate;

c.    That Defendant offer to reimburse all Class Members all expenses already incurred as a result of the DPF Defect, including repairs, diagnostics, and any other consequential and incidental damages (*e.g.* towing charges, vehicle rentals, etc.);

d.    That Defendant immediately cease the sale and leasing of the Class Vehicles at all authorized Jaguar Land Rover dealerships without first notifying the purchasers of the DPF Defect, and otherwise immediately cease to engage in the violations of law as set forth above;

e.    Damages and restitution in an amount to be proven at trial including, but not limited to, out-of-pocket expenses and diminution in value;

f.    An order certifying the proposed Class and Sub-Class, designating Plaintiffs as named representatives of the Class and Sub-Class, and designating the undersigned as Class Counsel;

g.  A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles' DPF;

h.  Any and all remedies provided pursuant to the state consumer protection laws, express and implied warranty laws, and fraudulent omissions laws alleged herein;

i.  An award to Plaintiffs and the Class of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

j.  A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, and/or make full restitution to Plaintiffs and Class Members;

k.  An award of attorneys' fees and costs, as allowable under the N.J. Stat. Ann. § 56:8-19, N.Y. G.BL. § 349(h), Cal. Civ. Code § 1750 *et seq.*, and the other laws pursuant to which Plaintiff's claims are brought or as otherwise allowed by law;

l.  An award of pre-judgment and post-judgment interest, as provided by law;

m.   Leave to amend the Complaint to add additional class representatives, and conform to the evidence produced at trial; and

n.   Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: August 28, 2020

Respectfully submitted,

By:  */s/ Kelly M. Purcaro*
Kelly M. Purcaro
**A.Y. STRAUSS, LLC**
101 Eisenhower Parkway, Suite 412
Roseland, New Jersey 07068
Tel.: (973) 287-5008
Fax: (973) 226-4104
kpurcaro@aystrauss.com

Marc L. Godino
 *(admitted pro hac vice)*
Danielle L. Manning
 *(admitted pro hac vice)*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
mgodino@glancylaw.com
lglancy@glancylaw.com
dmanning@glancylaw.com

Kevin Landau
(*pro hac vice*)
Brett Cebulash
 (*pro hac vice* to be filed)
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel.: (646) 873-7654
Fax: (212) 931-0703
klandau@tcllaw.com
cgoulding@tcllaw.com

Mark S. Greenstone
 (*admitted pro hac vice*)
**GREENSTONE LAW PC**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Tel.: (310) 201-9156
Fax: (310) 201-9160
mgreenstone@greenstonelaw.com

*Counsel for Plaintiffs and the Classes*